

# THE ATTORNEY GENERAL
## OF TEXAS

### AUSTIN, TEXAS 78711

WAGGONER CARR
ATTORNEY GENERAL

December 8, 1964

Honorable Joe Resweber
County Attorney
Harris County
Houston, Texas

Dear Mr. Resweber:

Opinion No. (C- 357)

Re: Whether Bayou Manor is
exempt from ad valorem
taxes as an institution
of purely public charity.

We quote the following excerpt from the memorandum brief which you submitted in connection with your request on the above captioned question:

"Brazos Presbyterian Homes, Inc., was chartered in 1960, by the State of Texas as a non-profit corporation 'to establish, construct, maintain, support and operate a retirement home or homes- - -for worthy older people.' The charter states that it was 'organized exclusively for charitable purposes as a non-profit corporation.'

"The corporation is an agency of the Presbytery of Brazos Presbyterian Church, U.S.. The building is a multi-story, modern structure containing 174 units consisting of 1 room efficiency, 1½ room and 2 room apartments situated on 6 acres of land in Houston, Texas. The apartments are unfurnished except for carpets and drapes and contain no kitchen facilities. There is a health center consisting of 12 rooms with 6 beds and plans for expansion to a 36 bed facility. A nurse is on duty at all times and several doctors on call.

"Bayou Manor furnishes its residents with living quarters, a health center, meals, religious services, a library complete with games, a sum deck, and a meeting room for family gatherings.

"The letter received by this office from the director of Bayou Manor contains the following statement:

'Residents are admitted by the Trustees on their ability to adjust to community living and their ability to pay. A regular schedule of fees calls for entrance fees ranging from $6,900.00 to $10,500.00 and Monthly Life Care Fees ranging from $200.00 per month to $240.00 per month. These fees are adjusted to the applicant's ability to pay.'

"Information received by this office indicates that as of September 9, 1964, there were 33 persons occupying 27 rooms at Bayou Manor. Of these 33 persons, 2 were full charity cases and 3 were partial charity cases. One other partial charity case was due to take up residence the following week."

In addition to the facts contained in your memorandum brief, you have furnished us the following information. Medical care is provided in the health center in the Manor in accordance with the patient's ability to pay. There is a dietician on duty who sees that any special diet, prescribed by a resident's doctor, is properly prepared. The acting director of the Manor has stated that it is their intention to care for more charity cases as funds become available either from donations or from profits realized from full paying guests. The further point is made that when the indebtedness incurred in constructing the Manor is retired, there will be more openings for charity cases. Specifically, the Manor seeks as occupants those individuals who are still mentally active but who need an atmosphere such as the Manor provides in order to prevent a developing state of mental depression or a feeling on the part of the individual of having outlived his usefullness.

This office has written numerous opinions concerning exemptions from state and county ad valorem taxes of homes for the aged under various fact situations. Attorney General Opinions Nos. WW-771 (1-7-60), WW-1277 (3-16-62), WW-1318 (4-17-62), WW-1424 (8-24-62) and C-209 (1-29-64) accorded exemption in view of the facts considered therein. The facts were held not to warrant exemption in Attorney General Opinions Nos. WW-1427 (8-30-62), C-27 (3-6-63) and C-184 (11-26-63).

Of these Opinions, we think Opinion No. WW-1277 is the most closely analogous in the facts therein considered to the facts which you present for our consideration. In this Opinion, Morningside Manor, Inc., hereinafter referred to as the Home, was seeking exemption from ad valorem taxes. This Home was incorporated under the Texas Non-Profit Corporation Act for charitable and benevolent purposes. The Home was also a project of a church, specifically the San Antonio District of the Methodist Church. It was designed to house approximately 109 residents. In contradistinction to the requirements of the Manor, the Home did not require an admission fee; however, the Home did require a contract from its residents under the terms of which the resident paid X dollars to the Home to provide against any contingencies that might arise with a provision for a refund of any amount remaining therein to the resident or to his estate. Likewise, those who were financially able to pay were required to do so. The facilities offered by the Home were much the same as those that are offered by the Manor. There were, at the time this Opinion was written, 22 persons residing in the Home, of which number three were charity residents, a percentage of 13.6% as opposed to the 5½% percentage presented by the facts in your case. The Methodist Church members had made contributions to help underwrite the costs of the Home and will continue to contribute to its support.

The Opinion points out that in pursuance to the authorization contained in Section 2 of Article VIII of the Constitution of the State of Texas to exempt from taxation ". . .institutions of purely public charity. . .", the Legislature enacted Article 7150, Vernon's Civil Statutes, the pertinent portion of which reads as follows:

"The following property shall be exempt from taxation, to-wit:

"...

"7. Public charities. All buildings and personal property belonging to institutions of purely public charity, together with the lands belonging to and occupied by such institutions not leased or otherwise used with a view to profit, unless such rents and profits and all moneys and credits are appropriated by such institutions solely to sustain such institutions and for the benefit of the sick and disabled members and their families and the burial of the same, or for the maintenance of persons when unable to provide for themselves, whether such persons are members of such institutions or not. An institution of purely public charity under this article is one which dispenses its aid to its members and others in sickness or distress, or at death, without regard to poverty or riches of the recipient, also when the funds, property and assets of such institutions are placed and bound by its laws to relieve, aid and administer in any way to the relief of its members when in want, sickness and distress, and provide homes for its helpless and dependent members and to educate and maintain the orphans of its deceased members or other persons."

Since we think holding of Opinion WW-1277 is correct and the reasons therefor equally applicable to this case, we quote the following excerpts therefrom:

"It is clear that under the above section /Section 7/ an institution can gain exemption for its 'buildings. . .together with the lands belonging to and occupied by such institutions' only if it is an 'institution of purely public charity.'

"In City of Houston v. Scottish Rite Benev. Ass'n., 111 Tex. 191, 198, 230 S.W. 978, 981 (1921), the court said that 'the Legislature might reasonably conclude that an institution was one of "purely public charity" where: First, it made no gain or profit; second, it accomplished ends wholly benevolent; and, third, it benefited persons, indefinite in numbers and in personalties, by preventing them, through absolute gratuity, from becoming burdens to society and to the state.'

"Admittedly, the Home meets the first requirement since it makes no gain or profit. Does it accomplish ends wholly benevolent and will it benefit persons indefinite in numbers by preventing them from becoming burdens to society and the State? In the brief submitted in support of the proposition that the property is taxable, it is argued that nineteen occupants are not faced with the probability that they will become a public charge since they are paying their room and board according to the schedule before quoted, that three are partially doing so, that none are on a 'full and exclusive charity basis. . .,' and that 'neither the Constitution or the courts have established a percentage of charitable use as a basis for an exemption except 100 per cent.' We think that these arguments are refuted by the decision in Santa Rosa Infirmary v. City of San Antonio, 259 S.W. 926, (Tex.Com.App., 1924).

"In the Santa Rosa case, the City of San Antonio and the San Antonio Independent School District instituted suit against the Sisters of Charity of the Incarnate Word, hereinafter referred to as Sisters of Charity, and the Santa Rosa Infirmary, hereinafter referred to as the Hospital, both incorporated for charitable purposes, to recover taxes assessed against the real estate and improvements thereon owned by the Hospital. The Hospital was a subsidiary of the Sisters of Charity and was controlled by it in the management and operation of its property.

"  .  .  .

"All patients whose financial condition per-
mitted them to pay for the hospital  services did so.
The money so received was used for the maintenance,
upkeep and improvements of the Hospital and main-
tenance of young Sisters, future members of the
Hospital, for the support of sick and disabled mem-
bers of the Hospital, and the balance went to a
building fund.  The Hospital had no other source of
revenue than that which it derived from its pay
patients.  The Sisters of the Hospital engaged in
other charities and charitable works.  They conducted
St. Luke's Free Clinic, fed and clothed the needy,
aided unwed mothers -- all of these additional
charities being performed from the general funds of
the Hospital.  There was testimony to the effect that
the large majority of patients were pay patients,
that the applicants for charity were comparatively
small in number, that the institution was entirely
self-sustained and in no way dependent on any out-
side charity or solicitations from other organi-
zations connected with the church.

"The court discusses the case of Morris v. Masons,
68 Tex. 703, 5 S.W. 519 (1887) which held that a
building owned by a Masonic body claiming to be a
purely charitable organization was not entitled to
exemption since the building was largely leased to
tenants from whom rentals were collected.  The court
therefore did not decide whether the Masonic body was,
in fact, a 'purely public charity.'  The court dis-
tinguished the Morris case from the case under considera-
tion on the ground that although the constitutional pro-
vision authorizing exemption was still the same, the
statutory provision implementing the constitutional pro-
vision had been amplified to include rents and profits
when appropriated by charitable institutions solely to
sustain such institutions.  The court stated that if the
language of the then controlling statute was to be given
effect, charitable institutions might use funds derived
'as an incident of the administration of their charities.'
(Emphasis supplied)  The court expressly rejected the
contention that the Hospital lost its status as a purely

public charity because the majority of the rooms
in the hospital was used to take care of pay patients
and stated at page 932 that '. . .the mere fact that
pay patients largely predominated over the charity
patients, or that the institution did not go out
into the highways and by-ways seeking out those to
whom its charitable offices might be extended, could
not, under the great weight of authority, be said
to so detract from its charities as to disqualify
it as an institution of purely public charity.

"At page 935, the court said:

'The theory upon which institutions
of this character are exempted from
taxation is that they serve the govern-
ment by relieving it to some extent of
what would otherwise be a public duty or
governmental function to care for the
indigent sick and afflicted, and it is
the assumption by such institutions of
this burden which compensates the govern-
ment for the exemption granted them from
the general obligation resting upon all
citizens to pay taxes.  It is therefore
essentially to the general public interest
that the facilities of these institutions
to carry on this burden be extended by
additional new structures, and building
funds, looking to that end and keeping
pace with a growing population and its
necessarily increasing demands for
charitable dispensations.'

"Both the State and Federal Governments are devoting
attention to the ever increasing problem of the aged who
constitute an ever increasing percentage of our population.
We think it is self-evident that an aged person need not be
wholly without financial means in order to become a public
charge.  The Home serves the Government by relieving it
to some extent from what would otherwise be a public duty
or governmental function to care for the aged, and may be
deemed, therefore, an institution of 'purely public
charity' as those words are used in our Constitution.

"Numerous decisions of our courts clearly establish the rule that in order to gain the exemption granted by Section 7 the 'institution of purely public charity' must not only own the property for which exemption is sought, but must, in addition, make an actual, direct and exclusive use of said property for charitable purposes. City of Longview v. Markham-McRee Memorial Hospital, 137 Tex. 178, 152 S.W.2d 1112 (1941); Markham Hospital v. City of Longview, 191 S.W.2d 695 (Tex. Civ.App. 1945, error ref.); Santa Rose Infirmary, supra; Benevolent and Protective Order of Elks v. City of Houston, 44 S.W.2d 488 (Civ.App. 1945, error ref.) In the brief submitted in support of the proposition that the Home is taxable, it is argued that the requisite of 'exclusive use' is not met in this case since some of the rooms will be rented. We do not think that this fact is determinative of the 'exclusive use' requirement but rather that that requirement is met by the fact that the property will be used exclusively for the charitable purpose of caring for the aged. We are unable to distinguish the occupancy of the Home by those aged persons who pay for their expenses and the occupancy of hospitals by pay patients. Of course, any change in the existing factual situation which prevents the Home from meeting the threefold requirements of (1) ownership of the property, (2) bona fide charitable purpose as evidenced by actual charitable work, and (3) exclusive use of the property by the charitable institution itself would result in a loss of the exemption accorded by Section 7. The determination of these controlling facts must always be made by the proper local authorities in deciding whether exemption will be accorded."

We quote the following excerpt from a copy of a letter from the attorneys for the Manor to the Tax Assessor and Collector of Harris County:

"In discussing with your office the original determination that Bayou Manor was not entitled to exemption, it was indicated that a short time ago there would have been little question concerning the exempt status of Bayou Manor under the then existing understanding of the provisions for exemption. It was stated, however, that the decision of the Supreme Court of Texas in River Oaks Garden Club v. City of Houston, 370 S.W.2d 851 (1963) has changed this understanding of the requirements for exemption. . . ."

We do not so construe the River Oaks Garden Club case. The Club was a non-profit corporation which maintained a landmark of historical value and had, as its main activity, the education and enlightenment of its members and the public in the art of growing and arranging flowers. Other non-profit organizations were permitted to use the property without charge. The Court of Civil Appeals had denied tax exemption for that reason. The Supreme Court held that it did not reach the question because there were far more basic reasons for holding that the exemption of the Club's property was not authorized by the Constitution under the provision of Section 2, Article VIII which empowers the Legislature to exempt "institutions of purely public charity."

The Club had not sought exemption under Section 7 of Article 7150, quoted supra at page 3. The Club's stated charter purposes were patterned after Section 14 of Article 7150 (pertaining to Societies of Fine Arts) and Section 20 of Article 7150 pertaining to non-profit organizations incorporated for the purpose of preserving historical building sites and land marks. It therefore sought exemption under these Sections.

At page 853, the Supreme Court cites numerous cases which have held that exemption is denied when property is not used exclusively by the owner for purposes of purely public charity. Two of the cases cited are City of Longview v. Markham-McRee Memorial Hospital and Benevolent and Protective Order of Elks v. City of Houston, also cited in Opinion No. WW-1277, supra, page 7. These cases are not in point in view of the Santa Rosa Infirmary case.

At page 854, the Court quotes the same excerpt from the Scottish Rite Benev. Ass'n. case which Opinion No. WW-1277 quotes as the accepted definition of an institution of purely public charity. Supra, page 4.

At page 855, the Court quotes from Massachusetts General Hospital v. Inhabitants of Bellmont, 233 Mass. 190, 124 N.E. 21, 25, to the effect that one ground upon which exemptions from taxation of charitable institutions can be justified in the constitutional sense is that they minister to human and social needs which the State might and does to a greater or less extent undertake to satisfy, thus discharging through the private charity an ultimate obligation of the state. This same theory was stated by the court in the Santa Rosa Infirmary case and is quoted, supra, at page 6.

In the argument submitted to us in support of the proposition that tax exemption should be denied, reliance is placed on that portion of the River Oaks Garden Club opinion, at pages 855 and 856, which states that if exemption were accorded the Club there would be no end of exemptions accorded club houses and meeting places owned by small groups of persons of common aesthetic interest who associate themselves to promote and enjoy their particular interests. The Court said at page 856:

> ". . .It is but a half stride from
> the art of gardening to the art of interior
> decorating, and less than a half stride to
> the art of dramatics. Many other are but
> a stride away."

We think, for the reasons stated in the last paragraph on page 6, supra, that there is a vast distinction between the examples above given by the Supreme Court and the caring for the aged. We are still unable to distinguish the occupancy of homes for the elderly by some residents who pay for their expenses and the occupancy of hospitals by some paying patients. It is true that the Court, in the River Oaks Garden Club case stated at page 856:

". . .The fact that an oragnization performs some charitable acts or engages in some charitable activity is not enough to qualify it for the tax exemption provided in Sec. 2, Art. VIII of the Constitution."

But the cases cited in support of this statement involved organizations engaged, not only in charitable activities, but also in unrelated activities distinctly non-charitable in nature.

For these reasons we do not think the River Oaks Garden Club case affects the holding of Opinion No. WW-1277 and that since the Manor meets the requirements of Opinion No. WW-1277, it is exempt from ad valorem taxes.

## S U M M A R Y

Under the submitted facts, Bayou Manor, operated by Brazos Presbyterian Homes, Inc., a charitable corporation, managing a home for older adults in Houston is an institution of purely public charity and is exempt from ad valorem taxes.

Yours very truly,

WAGGONER CARR
Attorney General of Texas

Marietta McGregor Payne
Assistant Attorney General

MMcGP:sjl

APPROVED:
OPINION COMMITTEE

W. V. Geppert, Chairman
W. E. Allen
Brady Coleman
George Black

APPROVED FOR THE ATTORNEY GENERAL
BY: Stanton Stone